Estate of Peter Rasmussen, Deceased, Mildred C. Rasmussen, Executrix v. Commissioner.
Estate of Rasmussen v. Commissioner
Docket No. 89391.
United States Tax Court
T.C. Memo 1961-328; 1961 Tax Ct. Memo LEXIS 21; 20 T.C.M. (CCH) 1694; T.C.M. (RIA) 61328; December 4, 1961
John M. Compton, Esq., 203 Financial Center Bldg., 40 North 1st St., San Jose, Calif., for the petitioner. Joseph D. Holmes, Jr., Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency of $22,628.49 in the estate tax of the estate of Peter Rasmussen. The issues remaining for decision are (1) whether the fair market value of stock and decedent's personal residence transferred prior to death *22 are to be included in decedent's gross estate as transfers in contemplation of death, within the meaning of section 2035 of the 1954 Code, and if not, (2) whether the fair market value of decedent's personal residence is to be included in decedent's gross estate as property transferred in which decedent has retained a life interest, within the meaning of section 2036 of the 1954 Code. Findings of Fact The stipulated facts are hereby found accordingly. Mildred C. Rasmussen (hereinafter called Mildred) is decedent's daughter and the executrix of the estate of Peter Rasmussen (hereinafter called decedent), who died in Oakland, California on August 1, 1956, at the age of 88 years, 7 months, and 22 days. The last will of decedent, dated February 23, 1956, was admitted to probate in the Superior Court of the State of California, County of Alameda, on September 6, 1956. Decedent was survived by three children, Mildred, Christian C. Rasmussen (hereinafter called Christian), and Florence K. Miles, aged 59, 57, and 53, respectively. Decedent's wife died in 1921 and from that time until the date of his death he lived with his daughter Mildred, who prepared his meals and kept house for *23 him. For many years prior to June 30, 1955, decedent had been president and majority stockholder of Cook and Company (hereinafter called the company), a California corporation doing a sheet metal business at 242 Steuart Street, San Francisco, specializing in fabricating metal bins and other metal items for installation aboard merchant ships. In April 1955, the outstanding stock of the company was held as follows: Shareholder
Number of Shares
H. C. Cook
79.8
N. C. Larson
1
Christian C. Rasmussen
24.8
Florence K. Rasmussen
5
Mildred C. Rasmussen
5
Peter Rasmussen
304.6
419.2 *
Decedent and Christian had a number of disagreements concerning the management of the company. These involved the payment of dividends regardless of the sufficiency of earnings and the purchase of the building which had been leased by the company as its business premises for many years. During 1954 and 1955, decedent met with the lessor's attorney on approximately ten separate occasions to discuss the purchase of the building, at which time decedent appeared interested in the purchase. Decedent, however, was opposed to the outlay *24 of the necessary money. In April 1955, decedent consulted Robert L. Webb, an attorney, about the transfer of his interest in the company to his three children, Christian, Mildred, and Florence K. Miles. At the same meeting, decedent inquired about the transfer of his house to Mildred. Decedent had for a long time intended to transfer the house to Mildred, since she had kept house for him. This was decedent's first professional visit to an attorney in many years. Webb suggested and initiated a review of the provisions of decedent's will of February 25, 1933. At the same meeting, Webb prepared a deed transferring title to the house to Mildred. This deed was delivered to Mildred on the same day, with the request by decedent that Mildred not record the deed until after his death. Decedent continued to live in the house until his final illness. Webb suggested that Mildred pay the real estate taxes. Mildred paid these taxes with money supplied by decedent. The deed was recorded on August 24, 1956, after decedent's death. When decedent consulted Webb about the transfer of his interest in the company, it was his desire that each of his three children receive an equal number of shares *25 of stock. However, he also desired to turn over control of the company to his son Christian by transferring to him the voting rights in a sufficient number of shares to insure Christian's control. Webb suggested a trust agreement to accomplish that end. On or about May 5, 1955, decedent made the following transfers of his stock in the company without receiving any consideration in money or money's worth: Number of Shares
Transferred
Transferee
100.1
Christian C. Rasmussen
50
Mildred C. Rasmussen
50
Florence K. Miles New stock certificates were issued for these shares on May 11, 1955. On May 6, 1955, Webb prepared and forwarded to decedent a codicil to the will of February 25, 1933. This codicil was executed by decedent on May 7, 1955. It devised to decedent's son Christian 100 shares in the company in trust for the benefit of decedent's daughters, Mildred and Florence K. Miles. Christian as trustee was authorized to vote these shares, guaranteeing him control of the company. The codicil was prepared as a stopgap measure which was to serve as a substitute trust instrument during Webb's reserve Army training and until Webb could draft a proper trust instrument. *26 On June 30, 1955, decedent resigned as president and as a director of the company and at the same meeting the remaining shareholders and directors voted to purchase the building at 242 Steuart Street, San Francisco, California. On July 5, 1955, a trust instrument prepared by Webb was executed by decedent as donor and Christian as trustee. Pursuant to this trust instrument, 100 shares of stock in the company were transferred to Christian, who was given the right to vote the stock as trustee for the benefit of decedent's daughters. Decedent did not receive any consideration in money or money's worth for this transfer. On or about July 5, 1955, decedent transferred his last remaining 4.5 shares in the company to his son-in-law, C. W. Miles, without receiving any consideration in money or money's worth. On or about July 5, 1955, decedent established an account in the Crocker-Anglo National Bank, San Francisco, deposited $2,500 therein, and gave Mildred written authorization as agent to draw thereon. This agency account was established by decedent at Webb's suggestion for the purpose of permitting withdrawals in the event decedent was unable to get to the bank. Mildred used funds *27 from this account during her father's last illness. Webb informed decedent of the saving of estate tax made possible by means of annual and outright gifts. Decedent made no other substantial gifts during 1955 or 1956. On February 23, 1956, decedent executed a new will, which was prepared for him by Webb. This was the will admitted to probate on September 6, 1956. Gift tax returns covering the transfer of the shares of stock in the company and the transfer of the house were filed by decedent. Prior to his final illness, decedent was in good health. The cause of decedent's death was a cerebral vascular accident and the length of his last illness was 5 days. The only change in decedent's investment outlook during his last years was his desire to turn the management of the company over to Christian. Decedent continued to visit his stockbroker's office periodically and actively bought and sold stock during 1955 and 1956. Decedent's family had a history of longevity. Both his mother and grandmother lived past the age of 90, while all his aunts died while in their 70's or 80's. Decedent was active and in good health until a week before his death and continued actively to control *28 his own affairs until that time. On August 1, 1957, the fair market value of the 304.6 shares of stock in the company transferred by decedent was $162.50 per share, and the fair market value of the house transferred by decedent to Mildred was $15,500. The transfer of stock to decedent's children was made in contemplation of death. The transfer of the house to Mildred was made in contemplation of death. Opinion Our task is to determine the "impelling motive," , pursuant to which decedent transferred his stock in Cook and Company and the residence in which he lived with one of his daughters. Since the transfer took place within 3 years of his death, the burden is on petitioner not only to show that respondent's determination was erroneous but that the transfers did not take place in contemplation of decedent's death. Sec. 2035 of the 1954 Code. In such a situation, if the evidence is in equipoise, so that no conviction for or against either party results, the one upon whom the burden rests will fail. . Ordinarily the burden may most satisfactorily be borne by showing *29 that decedent acted with a motive connected with life. In the present instance we find the evidence in this respect entirely unconvincing. Decedent's supposed motive of transferring voting control of the company is not adequate to account for his gift of shares to his other children and son-in-law, nor of the house to his daughter. It did in fact complicate rather than simplify the attainment of his alleged purpose. [1] In order to accomplish the purported objective, he had to create a trust in which the son was given the voting rights. This could as well, in fact much more simply, have been accomplished by a voting trust without giving up ownership of the shares. We find this so-called "life motive" totally unpersuasive. Nor is there any real reason given why decedent should have desired to transfer his residence to his daughter and certainly not why he should have postponed that action for many years. We have no explanation of the accompanying request that the *30 deed be withheld from record until after his death. Regardless of whether the transaction was adequate to transfer title under California law, we think the occurrence was some evidence that decedent was in reality acting with his death in mind. And there is nothing to indicate that this was not the impelling reason. This is not the only affirmative indication that the gifts were made in contemplation of death. Many of the criteria referred to as indicating such a frame of mind on the part of a decedent are present here. The disposition he made was the same as that contained first in a codicil and later in a revised will made at approximately the same time. ; . The transfers were made to the natural objects of his bounty. ; . There was no previous record of any substantial gifts. ; , *31 affd. . For all that appears, the stock and the residence constituted a substantial portion of decedent's taxable estate. ; (C.A. 6, 1944), affirming per curiam a Memorandum Opinion of this Court. Decedent's withdrawal from his activities with the company may be some indication that he was "[putting] his house in order against the time of his demise." (C.A. 8, 1937), affirming a Memorandum Opinion of this Court, certiorari denied . Decedent was past 88 years of age and "[old] age may give premonitions and promptings independent of mortal disease." . But these affirmative indications need not be relied on by respondent if, as we think, the basic burden of proof has not been borne by petitioner. As in , affirmed sub nom. , [2] the evidence showed that decedent *32 was in apparent good health and, as in that case, we also have made this a specific finding to give the petitioner any benefit to which that evidence may entitle it. It also appears that decedent had some relatives who lived to an age close to or even beyond that at which he then was, and of this finding also we have given petitioner the benefit. But we are cautioned that "contemplation of death [is] not necessarily contemplation of imminent death." . On the whole record we are unable to conclude that any evidence that decedent's impelling motive was one connected with life convincingly appears. Petitioner does not seem to us to have met the burden of proof imposed upon it by the statute and our findings incorporate this conclusion. We need not consider respondent's alternative reliance on section 2036(a)(1). Because of concessions by respondent, Decision will be entered under Rule 50. Footnotes
*. The erroneous addition is not explained.↩
1. After decedent had made the first transfer his son did not yet have control. This was attained only some time later by the establishment of the trust. But in the meantime the corporate action had already occurred.↩
2. Miscited by respondent as .↩